FILE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

THE LEONARD AND MADLYN ABRAMSON FAMILY :
CANCER RESEARCH INSTITUTE AT THE ABRAMSON CANCER :
CENTER OF THE UNIVERSITY OF PENNSYLVANIA : 11-cv-09108-LAK

                                         Plaintiff, : SECOND
                                                    : AMENDED
             -against- : <u>COMPLAINT</u>

CRAIG THOMPSON, M.D. , AGIOS PHARMACEUTICALS, INC., :
and CELGENE CORPORATION,
                                                  :
                                  Defendants.

------------------------------------------------------------------X

Plaintiff The Leonard and Madlyn Abramson Family Cancer Research Institute at the Abramson Cancer Center of the University of Pennsylvania ("Institute"), by its attorneys, Robinson Brog Leinwand Greene Genovese & Gluck P.C., as and for its Second Amended Complaint against defendants Craig Thompson, M.D., Agios Pharmaceuticals, Inc. and Celgene Corporation, alleges as follows:

### Nature of Action

1. The Plaintiff Institute was created by an agreement between The Abramson Family Foundation ("Foundation") and the Trustees of the University of Pennsylvania ("University"). Upon its creation, the Institute became a party to that agreement. Pursuant to that agreement, the Foundation donated in excess of One Hundred Million Dollars to the Institute with an ironclad condition that the money was to be utilized to revolutionize the medical treatment of cancer by exploring only new and different approaches to cancer treatment. Another fundamental condition of the agreement was that the Institute would own all or part of all discoveries and developments, whether patentable or not, occasioned or fostered by Institute-funded work. Accordingly, the Institute would share in the proceeds from any development achieved through the Institute funding. In that manner, the Foundation donation would continue to fund untold advancements in cancer treatment for generations to come.

2. An unscrupulous doctor, Defendant Craig Thompson, M.D., however, chose to abscond with the fruits of the Abramson largess generated by his work at the Institute and thereby cheat

future generations of the intended benefits of the donation and the Institute's intellectual property. Early in his association with the Institute, Dr. Thompson appeared to adhere to his contractual disclosure requirements relating to any intellectual property conceived, discovered, developed or reduced to practice at the Institute, and to any inventions derived from that intellectual property. Later, however, perhaps when the true magnitude of his discoveries was becoming known, Dr. Thompson fraudulently misrepresented the nature and results of his work at the Institute to avoid meeting further disclosure requirements. Although the Institute and Dr. Thompson had early discussions concerning the formation of a non-profit corporation to capitalize on developments at the Institute, Dr. Thompson later created a for-profit corporation that he concealed from the Institute. After a name change, that entity became the Defendant Agios Pharmaceuticals, Inc. ("Agios"). Dr. Thompson did not disclose to the Institute that at least $261 million has thus far been obtained by Agios with respect to what Agios has described as its "innovative cancer metabolism research platform" – i.e. the precise description of Dr. Thompson's work at the Institute. Dr. Thompson did not disclose to the Institute that Agios purported to sell to Defendant Celgene Corporation ("Celgene") an exclusive option to develop any drugs resulting from the cancer metabolism research platform.

       3.       The public interest, and the terms of the Institute's funding to Dr. Thompson, mandate that he now be held to account.

**Parties**

       4.       Plaintiff Institute is a non-stock, non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania and qualifies as tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and as a medical research organization within the meaning of Code Section 170(b)(1)(A)(iii). The Institute is a citizen of Pennsylvania and has its principal place of business located at 1600 Penn Tower, 3400 Spruce Street, Philadelphia, PA 19104.

       5.       Defendant Craig B. Thompson, M.D. is a medical doctor and is currently the President and Chief Executive Officer of Memorial Sloan-Kettering Cancer Center ("Sloan-Kettering")

located at 1275 York Avenue, New York, NY 10065, and is a citizen of New York residing in New York City.

6. Defendant Agios Pharmaceuticals, Inc. is a corporation incorporated under the laws of the State of Delaware and is a citizen of the State of Massachusetts with its principal place of business and corporate headquarters located at 38 Sidney Street, Cambridge, MA 02139.

7. Defendant Celgene Corporation is a corporation incorporated under the laws of the State of Delaware and is a citizen of the State of New Jersey with its principal place of business and corporate headquarters located at 86 Morris Avenue, Summit, NJ 07901.

### Jurisdiction & Venue

8. Subject matter jurisdiction as to this matter is based upon 28 U.S.C. § 1332 in that the parties are of diverse citizenship and the amount in controversy is in excess of $75,000.

9. Venue is based upon 28 U.S.C. § 1391(a)(1) & (2), on the grounds that the principal defendant, Craig Thompson, M.D., is a citizen and resident in this District, a substantial part of the events or omissions giving rise to the claims arose in this District and a substantial part of the property that is the subject of this action is located in this District.

### Factual Allegations

### The Abramson Cancer Institute Agreement

10. The Institute was formed pursuant to the terms of an agreement, dated as of September 30, 1997 (the "Institute Agreement"), between the Foundation, a Florida trust, and the University, a Pennsylvania non-profit corporation which includes the Hospital of the University of Pennsylvania and its School of Medicine.

11. Section 1.1 of the Institute Agreement states that the mission of the Institute shall be as follows:

> "1. To create a new level of research and treatment that does not duplicate current University supported programs, nor create redundancy or replication of current programs.

3

> "2. To support only new forms of research and treatment which will create new dimensions in healthcare to aid humankind.
>
> "3. To improve the treatment of cancer to the extent that will make current treatment obsolete."

12.  The Institute Agreement states that the Foundation intends to provide support to the Institute of at least One Hundred Million Dollars ($100,000,000) "only as and if criteria are established and satisfied, evidencing that the Institute is successfully achieving the mission set forth in Section 1.1...." Id., at § 1.3.1. The Institute Agreement provided for an initial contribution of Ten Million Dollars ($10,000,000). Id. To date, the Foundation has provided funding pursuant to the terms of the Institute Agreement in the amount of over $110 million.

13.  The Institute Agreement also provides that all contributions made by the Foundation "shall be for reasonable and necessary expenses paid to accomplish the Institute's purposes as well as to acquire assets used directly in carrying out one or more of its purposes...." Id., at § 1.3.3.

14.  Section 5.1 of the Institute Agreement addresses ownership of patents, copyrights and intellectual property.

15.  Section 5.1.1 provides for Institute-Supported Research, as follows:

> "All right, title and interest with respect to all technical information, know-how, trade secrets, developments, software, methods, techniques, formulae, data, processes, inventions, discoveries, improvements, and other proprietary ideas and intellectual property (together 'Intellectual Property'), whether or not patentable or copyrightable, that are conceived, discovered, developed or reduced to practice pursuant to or in the course of Institute Research Programs whose budgets are funded solely by the Institute ('Institute-Supported Inventions') will be the sole property of the Institute, subject to the other provisions of this Article 5 and the [Faculty Rights]."

16.  Section 5.1.3 provides for Jointly-Supported Research, as follows:

> "All Intellectual Property, whether or not patentable or copyrightable, that is conceived, discovered, developed or reduced to practice pursuant to or in the course of Institute Research Programs whose budgets are funded by multiple sources, i.e., the Institute, the University and/or third-party sources ('Jointly-Supported Inventions') will be joint property of

>the Institute and the University, subject to the other provisions of this Article 5 and Faculty Rights."

17. Section 5.4 of the Institute Agreement provided for the use of Subject Inventions, including the following terms:

>"The owner(s) of each Subject Invention will have the exclusive right to determine how best to develop or commercialize each Subject Invention, including the right to license the Subject Invention to a third party...."

18. In addition, the University's policies and procedures for the administration of supported research programs were adopted by the Institute. Id., at § 2.1.

19. The Institute provided funding to Dr. Thompson in the total amount of not less than $14 million. See Exhibit A attached hereto.

**Dr. Thompson's Work At The Institute**

20. Dr. Thompson joined the Institute in June of 1999 as Scientific Director. Dr. Thompson's duties included directing, overseeing and managing the Institute's Cancer Cell Biology Program.

21. Dr. Thompson's work at the Institute included, inter alia, developing a cancer metabolism research platform that would examine the role that metabolic changes play in the origins and progression and death of cancer cells.

22. In 2003, Dr. Thompson advised the Institute that his laboratory had recently discovered that cancer cell growth requires an enzyme not previously implicated in cancer.

23. In a 2004 memo to the Institute, Dr. Thompson reviewed several innovations in cancer research and, referring to joint projects with GlaxoSmithKline ("GSK"), acknowledged that: "Any intellectual property developed from this collaboration will be shared jointly between the [Institute], University of Pennsylvania and GSK."

24. In 2005, Dr. Thompson acknowledged in a memo to the Institute that: "Over the past six years, the Institute has developed considerable intellectual property." That memo further noted that: "Drs. Thompson and [other Institute personnel] are exploring the possibility of forming a non-profit

5

development and therapeutics company through which the Institute could capitalize on its intellectual property."

25. A patent application had been filed on or about January 19, 2006 for "Regulation of Autophagy and Cell Survival" which listed Dr. Thompson as inventor and which was assigned to the University.

26. In 2007, Dr. Thompson reported that his work at the Institute definitely provided evidence that regular or intermittent use of drugs such as metformin could reduce the risk of cancer. Dr. Thompson stated that metformin might be used as part of primary cancer treatment and may enhance the effectiveness of other cancer drugs if human clinical trials resulted in findings similar to those in studies of lab mice at the Institute.

27. Dr. Thompson also reported that researchers at the Institute had found that an agent called AICAR had an effect similar to that of metformin in suppressing the growth of breast cancer cells.

28. The work at the Institute was also stated to undermine other theories concerning the effect of metformin in reducing certain cancer risks by understanding that the drug is effective on a genetic level against cancer.

29. On August 7, 2007, Defendant Agios was incorporated in Delaware under the then utilized name of "Cancer Metabolism Therapeutics, Inc" by Dr. Thompson, Tak Mak ("Mak") and Lewis Cantley ("Cantley"). Dr. Thompson did not advise the Institute of the formation of that entity.

30. On September 24, 2007, Cancer Metabolism Therapeutics, Inc. registered to do business in the Commonwealth of Massachusetts.

31. In early 2008, Dr. Thompson, Mak and Cantley discussed changing the Cancer Metabolism Therapeutics, Inc. name to Agios. The law firm of WilmerHale was retained to determine the availability of the name "Agios."

32. On or about April 7, 2008, a certificate of amendment was filed with the Secretary of State of the State of Delaware and with the Secretary of the Commonwealth of

6

Massachusetts changing the name of the corporation from Cancer Metabolism Therapeutics, Inc. to the name of Defendant Agios Pharmaceuticals, Inc. Dr. Thompson is listed as a director of Agios beginning with its 2007 Annual Report. Dr. Thompson did not advise the Institute of the name change to Agios and his appointment as a director.

33. News reporting in 2008 described Agios as a company founded by pioneers in the emerging field of cancer metabolism, and announced that it had received $33 million in funding for that work. The law firm of WilmerHale was involved in the preparation of papers relating to that financing.

34. In 2008, Dr. Thompson, Mak and Cantley reviewed intellectual property matters related to Agios including, but not limited to, the subject of autophagy, as to which Dr. Thompson had filed a patent as alleged above in paragraph 24.

35. On or about November 12, 2008, a University Center for Technology Transfer Invention Disclosure Form was filed for Inhibition of Glutaminolysis for the Treatment of Cancer which listed Dr. Thompson as the primary contributor.

36. In late 2008, Agios conceded that it needed to license intellectual property with respect to work performed by Dr. Thompson at the Institute including, but not limited to, a license for S4162 "Concurrent mTOR Inhibition and Autophagy Inhibition as Combination Antineoplastic Therapy" and for a license with respect to Phenformin, which is related to metformin, which is referenced in paragraphs 25 through 27 above.

37. In 2009, Agios publicly asserted that it was the first biopharmaceutical company focused on discovering and developing novel cancer metabolism drugs.

38. In 2009, Agios publicly acknowledged that Dr. Thompson was Director of the Abramson Cancer Center at the University of Pennsylvania, stated that Dr. Thompson was one of the three founders of Agios, and announced the publication in the leading scientific journal Science of an article co-authored by Dr. Thompson titled "Understanding the Warburg Effect: The Metabolic Requirements of Cell Proliferation."

39. In early 2009, Agios continued to engage in discussions with the University concerning licenses for the following dockets: (a) R3799 "Growth Factor Regulation of Autophagy and Cell Survival in the Absence of Apoptosis"; (b) the aforementioned S4164 described in paragraph 34 above; (c) S4163 "Chloroquine Derivatives as Autophagy Inhibitors for Cancer Therapy"; and (d) U4653 "Phenformin in Cancer Therapy."

40. In late 2010, Dr. Thompson took a one year leave of absence from the Institute, during which he commenced work as the President and Chief Executive Officer of Sloan-Kettering and continued his affiliation with Agios.

41. Dr. Thompson terminated his employment relationship with the Institute and the University on October 31, 2011.

42. Agios and Thompson failed and refused to execute any license with the University with respect to the work he had performed during the time that he and his laboratory received over $13 million in funding from the Institute. Agios and Thompson never communicated with the Institute regarding the licensing of any Intellectual Property.

**Dr. Thompson's Work After Leaving The Abramson Cancer Center**

43. Sloan-Kettering publicly announced that Dr. Thompson had begun a collaboration with a Sloan-Kettering oncologist while Dr. Thompson was still at the Institute, and that such work would continue at Sloan-Kettering.

44. On April 15, 2010, Agios and Defendant Celgene Corporation ("Celgene") announced the formation of a global strategic collaboration focused on targeting cancer metabolism.

45. The collaboration between Agios and Celgene was stated to be based upon what was described as "the transformational science of Agios' innovative cancer metabolism research platform."

46. Pursuant to the collaboration, Agios was stated to have received a $130 million upfront payment, including an equity investment, in return for Celgene receiving an initial period of

exclusivity during which Celgene has the option to develop any drugs resulting from the Agios cancer metabolism research platform.

47. As part of the April 15, 2010 press release, Agios described itself as "dedicated to the discovery and development of novel therapeutics in the emerging field of cancer metabolism." Agios further noted that: "The Company's founders [including Dr. Thompson] and scientific advisors represent the core thought leaders in the field of cancer metabolism responsible for key advances, insights and discoveries in the field."

48. In October 2011, it was publicly reported that Celgene had extended its agreement with Agios to four years from three and provided an additional $20 million payment to Agios. It was also reported that Celgene was given the right to further extend the deal, and given an exclusive option to license any of the drugs for an undisclosed period of time.

49. Reporting in October 2011 described the Agios and Celgene deal as "Anatomy of an Ultra-Valuable Biotech Marriage."

50. The October 2011 reporting noted that "Agios's scientific co-founders were three of the most renowned pioneers of cancer metabolism," with one of them being Dr. Thompson. That reporting stated that "Craig Thompson from the University of Pennsylvania" and two others had "discovered that targeting certain metabolic enzymes could fundamentally alter cancer pathways" and took steps "to turn that discovery into a company that could be a 'prolific discoverer of new products.'"

51. On November 17, 2011, it was publicly reported that Agios received an additional $78 million investment from existing and new funding sources to focus on "inborn errors of metabolism."

**The Concealment Of Agios And The Nature Of Its Business**

52. Dr. Thompson did not advise the Institute or the University that he was a founder of Agios.

53. Dr. Thompson did not advise the Institute or the University that he was a director of Agios.

54. When the University learned of the existence of Agios and Dr. Thompson's involvement with Agios, the University inquired of Dr. Thompson as to:

   (a) whether his association with Agios involved any Tangible Research Property or Inventions as those terms are defined in the Patent and Tangible Research Property Policies and Procedures of the University ("Patent Policies") which are incorporated into the Institute Agreement; and

   (b) whether his association with Agios was a matter that came within the purview of the University's Center for Technology Transfer.

55. Dr. Thompson stated to the University that his association with Agios did not involve any property subject to the provisions of the Patent Policies.

56. Dr. Thompson stated to the University that his association with Agios did not come within the purview of the University's Center for Technology Transfer.

57. In reliance upon Dr. Thompson's aforementioned statements concerning his association with Agios, the University did not at that time pursue any further inquiry concerning any continuing interest that the University or Institute would have in the work being performed by Agios.

58. As a result of Dr. Thompson's concealment, the Institute did not learn of Dr. Thompson's involvement with Agios until late 2011.

**FOR A FIRST CAUSE OF ACTION**

**FOR A DECLARATORY JUDGMENT AS TO**
**<u>INTERESTS IN INTELLECTUAL PROPERTY RIGHTS</u>**
**(Affecting All Defendants)**

59. Plaintiff repeats and realleges the allegations of paragraphs 1 through 50 above.

60. Upon information and belief, Dr. Thompson has purported to convey to Agios rights and/or interests related to Tangible Research Property and Inventions funded in part or in whole by the Institute.

61.     Upon information and belief, Agios has purported to convey to Celgene rights and/or interests related to Tangible Research Property and Inventions funded in part or in whole by the Institute.

62.     A justiciable case and controversy exists as to the rights and interests of the Institute and each of the Defendants in the medical research, including - but not limited to - the cancer metabolism research platform that formed the focus of Dr. Thompson's work, that was funded in part or in whole by the Institute.

63.     Accordingly, a judgment should be entered declaring the respective rights and interests of each party.

## FOR A SECOND CAUSE OF ACTION

### FOR SPECIFIC PERFORMANCE OF THE DUTIES TO IDENTIFY TANGIBLE RESEARCH PROPERTY AND INVENTIONS
(Against Defendant Craig Thompson, M.D.)

64.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 55 above.

65.     Dr. Thompson, as a condition of his funding by the Institute, had a duty to identify Tangible Research Property and Inventions.

66.     Dr. Thompson failed and refused to identify Tangible Research Property and Inventions funded in part or in whole by the Institute.

67.     By reason of the foregoing acts and omissions, Dr. Thompson failed to comply with his duties to the Institute.

68.     The Institute has no adequate remedy at law, and therefore Dr. Thompson should be ordered to specifically perform the duty to identify Tangible Research Property and Inventions funded in part or in whole by the Institute.

## FOR A THIRD CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION & OMISSION
(Against Defendant Craig Thompson, M.D. and Agios)

69.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 60 above.

11

70. Dr. Thompson initially acknowledged to the Institute and the University that his activities were creating intellectual property in which the Institute had interests.

71. Agios initially acknowledged that it was necessary for Agios to obtain licensing with respect to intellectual property derived from Dr. Thompson's work funded by the Institute, including, but not limited to, the intellectual property identified in paragraphs 35 through 38 above.

72. Later, however, Dr. Thompson and Agios - through intentional misrepresentation and/or material omission - led the University and Institute to believe that Dr. Thompson's work funded in part or in whole by the Institute did not include any Tangible Research Property or Inventions related to the cancer metabolism research platform.

73. The University and the Institute reasonably relied to their detriment upon the intentional misrepresentation and/or material omission made by Dr. Thompson and Agios, and therefore did not take steps to protect their interests.

74. Upon information and belief, Dr. Thompson and Agios knowingly misrepresented to Celgene that he had sole ownership of all work funded in part or in whole by the Institute related to the cancer metabolism research platform.

75. Agios obtained not less than $228 million in funding based, upon information and belief, on fraudulent misrepresentation and omission as to Agios' rights with respect to the work funded in part or in whole by the Institute.

76. By reason of the foregoing acts and practices, Dr. Thompson and Agios committed fraudulent misrepresentations and/or omissions.

77. By reason of the foregoing, the Institute has suffered damages in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion.

## FOR A FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY
(Against Defendant Craig Thompson, M.D.)

78.  As a recipient of funding by the Institute, and as governed by all relevant terms and conditions, Dr. Thompson had a fiduciary duty to identify Tangible Research Property and Inventions funded in part or in whole by the Institute.

79.  By reason of the forgoing acts and practices, Dr. Thompson breached his fiduciary duty.

80.  By reason of the foregoing, the Institute has suffered damages in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion.

## FOR A FIFTH CAUSE OF ACTION

### BREACH OF CONTRACT
(Against Craig Thompson, M.D.)

81.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 71 above.

82.  \ By virtue of the terms of the Institute Agreement and the other matters incorporated therein, Dr. Thompson had a contractual duty to identify Tangible Research Property and Inventions funded in part or in whole by the Institute.

83.  By reason of the forgoing acts and practices, Dr. Thompson breached his contractual duty.

84.  By reason of the foregoing, the Institute has suffered damages in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion.

WHEREFORE, judgment should be entered:

    a. On the First Cause of Action, declaring the respective rights and interests of each party;

    b. On the Second Cause of Action, directing Defendant Thompson to perform his duty to identify Tangible Research Property and Inventions;

c. On the Third Cause of Action, awarding damages to the Institute in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion;

d. On the Fourth Cause of Action, awarding damages to the Institute in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion;

e. On the Fifth Cause of Action, awarding damages to the Institute in an amount that cannot currently be calculated but is estimated to ultimately exceed $1 billion; and

f. Awarding such other and further relief in favor of Plaintiff as this Court deems just and proper.

Dated: New York, New York
       February 17, 2011

                                              **ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**

                                              By: _____
                                                  David C. Burger (DB-8666)
                                            875 Third Avenue
                                            New York, New York 10022
                                            (212) 603-6361
                                            **Attorneys for Plaintiff**

# EXHIBIT A

Approximate Funding Provided by AFCRI to Dr. Craig Thompson

| Budget Year | Institute Funded Salary | Institute Funded Employee Benefits | Institute Funding of Dr. Thompson's Cancer Cell Biology Research Program | Total* |
|---|---|---|---|---|
| 10/1/98 - 9/30/99 | $154,800 (4 months @ $464,400/yr.) | $47,700 (30.8% of Institute salary) | $411,698 | $614,198 |
| 10/1/99- 9/30/00 | $495,000 | $142,065 (28.7% of Institute salary) | $799,564 | $1,436,629 |
| 10/1/00- 9/30/01 | $476,631 | $139,175 (29.2% of Institute salary) | $795,559 | $1,411,365 |
| 10/1/01- 9/30/02 | $480,020 | $140,220 (29.2% of Institute salary) | $794,559 | $1,414,799 |
| 7/1/02- 6/30/03 | $497,007 | $154,070 (31% of Institute salary) | $794,559 | $1,445,636 |
| 7/1/03- 6/30/04 | $490,100 | $156,830 (32% of Institute salary) | $794,559 | $1,441,489 |
| 7/1/04- 6/30/05 | $471,720 | $155,665 (33% of Institute salary) | $794,559 | $1,421,944 |
| 7/1/05- 6/30/06 | $387,910 | $128,010 (33% of Institute salary) | $694,559 | $1,210,479 |
| 7/1/06- 6/30/07 | $405,525 | $129,770 (32% of Institute salary) | $795,559 | $1,330,854 |
| 7/1/07- 6/30/08 | $350,000 | $112,000 (32% of Institute salary) | $694,559 | $1,157,559 |
| 7/1/08- 6/31/09 | $250,000 | $79,000 (31.6% of Institute salary) | $794,559 | $1,123,559 |
| 7/1/09- 6/30/10 | $250,000 | $79,000 (31.6% of Institute salary) | $794,559 | $1,123,559 |

*These numbers do not include additional compensation paid to Dr. Thompson such as annual bonuses.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

| | | |
|---|---|---|
| THE LEONARD AND MADLYN ABRAMSON FAMILY CANCER RESEARCH INSTITUTE AT THE ABRAMSON CANCER CENTER OF THE UNIVERSITY OF PENNSYLVANIA | : | 11-cv-09108-LAK |
| Plaintiff, | : | AFFIDAVIT OF |
| -against- | : | SERVICE |
| CRAIG THOMPSON, M.D., AGIOS PHARMACEUTICALS, INC., and CELGENE CORPORATION, | : | |
| Defendants. | : | |

----------------------------------------------------------------X

STATE OF NEW YORK   )
                                    ) ss. :
COUNTY OF NEW YORK   )

  JOANNE M. BRENNAN, of full age, deposes and says:

  I am not a party to this action, am over the age of 18 years, reside in the State of New York and am an employee of Robinson Brog Leinwand Greene Genovese & Gluck P.C.

  On February 17, 2012, I served a true copy of the annexed SECOND AMENDED COMPLAINT by Federal Express overnight delivery thereon, by depositing said document in a sealed envelope, into the custody of Federal Express within the State of New York, addressed as indicated below:

Paul Weiss, Rifkind, Wharton & Garrison LLP
Attorneys for Defendant Craig Thompson, M.D.
1285 Avenue of the Americas
New York, New York 10019

Wilmer Cutler Pickering Hale & Dorr LLP
Attorney for Defendant Agios Pharmaceuticals, Inc.
399 Park Avenue, 31st Floor
New York, New York 10022

Kaye Scholer, LLP
Attorneys for Defendant Celgene Corporation
425 Park Avenue
New York, New York 10022

*Joanne Brennan* (signed)

Sworn to before me this
17th day of February, 2012

*Notary Public* (signed)

JOANNE DiMEO
Notary Public, State of New York
No. 01DI6003812, Qualified in Nassau County
Certificate Filed in New York County
Commission Expires March 9, 20 14